UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| **ARCANGELO, INC.** and **BUYING POWER UNITED, LLC,** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 3:13CV104-PPS/CAN |
| **DIRECTBUY, INC.** and **TRIVEST PARTNERS, LP,** | ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

Defendant DirectBuy is a franchisor of members-only buying club franchises, from which members can buy home and office furnishings and other products. The plaintiffs in this would-be class action are ArcAngelo and Buying Power United, both of whom are franchisees of Direct Buy. For the sake of simplicity I will refer only to ArcAngelo in this opinion. ArcAngelo believes that over a period of years DirectBuy charged the franchisees more for advertising and marketing than the Franchise Agreement allowed. In addition to DirectBuy, Trivest Partners, LP, is also named as a defendant. Trivest, LP is alleged to control Trivest Fund IV, LP, the company that acquired a controlling interest in DirectBuy in late 2007. The complaint contains a number of causes of action, including breach of contract and of the duty of good faith, tortious interference with the Franchise Agreements, criminal conversion, unjust enrichment, and breach of fiduciary duty, and also seeks a declaratory judgment that certain provision of the Franchise Agreements are void and unenforceable. DirectBuy and Trivest have filed a motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6).

The Supreme Court interpreted the Rule 12(b)(6) pleading standard in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). To survive a motion to dismiss under that standard, a complaint must "state a claim to relief that is plausible on its face," which in turn requires factual allegations sufficient to permit a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. 570, 556. Where even the well-pleaded facts do not plausibly support an entitlement to relief on the legal theory identified, a claim is subject to dismissal. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557).

**Breach of Contract - Count I**

Count I is a contract claim which DirectBuy argues is subject to dismissal because it is based on a flawed reading of the Franchise Agreement. [DE 32 at 8.] Because I conclude that the relevant contract provisions are not so clear and unambiguous as DirectBuy and Trivest contend, this argument does not support dismissal.

 ArcAngelo alleges that "Paragraph 3.03 of the DirectBuy Franchise Agreements limits DirectBuy's right to charge Franchisees for national marketing and advertising to a maximum of 3% of annual gross new membership sales (the '3% Cap')." [DE 1 at ¶3.] The language ArcAngelo relies on reads as follows:

> **3.03  Marketing and Legislative Fund Contributions**.  You agree to contribute (at such times as we may designate from time to time) to the Marketing and Legislative Fund $1,000 during each of our fiscal years, except that you are not required to make any contributions during the first 12 months in which you operate your Center.  We have the right from time to time to increase the amount you are required to contribute to the Marketing and Legislative Fund, provided we may not increase the amount of your contributions to more than 3% of the gross

>amounts you charge for new memberships (including renewal option fees, but excluding renewal fees).

[DE 1-1 at 10.] ArcAngelo contends that "Franchisee contributions to fund the creation, development, and placement of marketing, advertising and related programs are expressly capped" by the 3% limitation in §3.03, but that DirectBuy breached that limitation by implementing "a marketing and advertising program that drastically exceeded the mutually-agreed upon 3% Cap." [DE 1 at ¶¶27, 29.]

Section 7 of the agreement also deals with the concept of "Marketing and Advertising." Here's what it says, in pertinent part: "[DirectBuy] may, in our sole discretion, establish and administer a fund ("the Marketing and Legislative Fund") for the creation and development of marketing, advertising, and related programs and/or legislative, legal and regulatory defense programs relating to buyer clubs and other laws and regulations that affect DirectBuy centers." [DE 1-1 at 19.] Section 7.01 goes on to explain that DirectBuy "will have sole discretion over all aspects of programs financed by the Marketing and Legislative Fund, including creative concepts, media, materials and endorsements of marketing and advertising programs," and that DirectBuy cannot assure franchisees "that any particular DirectBuy center will benefit directly or pro-rata from the placement of advertising." [*Id*. at 20.] The Fund "may be used to pay for the cost of preparing and producing marketing and advertising materials and programs we select, including television and Internet media (such as Web sites), video, audio and written advertising materials," and DirectBuy "may furnish [franchisees] with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges." [*Id*.]

There is yet another section of the Franchise Agreement which deals with "Marketing Materials" – that is §4.04.  That section provides that the franchisees "agree to execute such agreements as we may require to protect our interests in connection with any Marketing Materials and to pay such reasonable charges for Marketing Materials as we may assess from time to time." [DE 1-1 at 13.]  Section 4.04 defines "Marketing Materials" as "sales and marketing tools and materials as [DirectBuy], from time to time, develop[s] and use[s] for DirectBuy Centers, such as infomercials, Internet marketing tools (e.g., member marketing websites), sales videotapes and sales materials."

The definitional language in §4.04 and §7.01 is overlapping in that both sections refer to marketing and advertising materials, including websites and video.  DirectBuy unpersuasively suggests that the language of the two provisions clearly indicates that costs associated with the *placement* of advertising, as opposed to the *creation and development* of advertising, fall only within the ambit of §4.04.  The problem with this reading is that §7.01 refers to "the placement of advertising" and §4.04 does not, so the division of the costs associated with the different functions is not so clear as DirectBuy insists.  The overlap in the two provisions hardly constitutes the kind of "unambiguous terms of the Franchise Agreement" that DirectBuy blithely insists create a clear distinction that defeats ArcAngelo's reading of the contract.

At this stage of the case, I can't make a definitive interpretation of these interrelated contractual provisions and their application to the disputed charges.  DirectBuy raises a question about whether the Marketing and Legislative Fund ever actually existed, but the allegations of the complaint plausibly suggest that it did, and any fact dispute cannot be resolved on a motion to dismiss.  In any event, the fundamental question to be answered in this case is whether the charges that ArcAngelo complains of were assessed as contributions to the Marketing and

Legislative Fund (under §3.03 and §7.01) or were they assessed as charges for Marketing Materials (under §4.04)? Or were they imposed as fees of some other kind altogether? What ArcAngelo characterizes as charges for national marketing and advertising programs subject to the 3% cap, DirectBuy characterizes as charges for "sales leads" that are governed by §4.04 and not subject to any cap (except for reasonableness). [DE 32 at 1.] To get to the bottom of the disagreement about the disputed charges, a number of subsidiary questions need to be resolved. These involve factual determinations that cannot be made at this time. The complaint's allegations are sufficient to permit a reasonable inference that DirectBuy and Trivest are liable for breach of the Franchise Agreement.

DirectBuy also suggests that ArcAngelo's reading of the agreement is defeated by the contrary determination of a Pennsylvania bankruptcy court. *See In re Trinity Innovative Enterprises, LLC*, Case No. 09-20579-REF (Bankr.E.D.Penn. 2009). [DE 32-1 and 32-2.] *Trinity* is cited as persuasive authority. Of course, it has no preclusive effect because neither of the plaintiffs in this case were parties to that proceeding. But more importantly, the bankruptcy judge's determinations in *Trinity* involved factual findings based on an evidentiary hearing and record that included evidence concerning the history of the Marketing and Legislative Fund, the practices and methods for DirectBuy's assessment of fees to its franchisees generally and its history with the franchisee in that case. [DE 32-1 & 32-2.]

The procedural posture of the *Trinity* case demonstrates why I must deny DirectBuy's motion to dismiss. The bankruptcy judge in Pennsylvania had the benefit of full factual record before him; I have no such factual record before me at this point. ArcAngelo argues that *Trinity* was wrongly decided, but at this point that is neither here nor there. When and if this case

reaches a similar stage, I will give Judge Fehling's analysis the consideration appropriate for such non-controlling authority.

**Breach of Duty of Good Faith - Count I**

Count I of the complaint also asserts a breach by DirectBuy of a duty of good faith. DirectBuy argues that the governing law of Indiana does not recognize the existence of such a duty associated with the Franchise Agreement at issue here. Under Indiana law, a duty of good faith and fair dealing is implied only in certain kinds of contracts, such as insurance contracts, employment contracts, contracts under the Uniform Commercial Code as adopted in Indiana, and contracts that are "ambiguous as to the application of the covenants." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. App. 2011).

Only the last of these four possibilities might apply here. *Coates* relied on *First Federal Savings Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600 (Ind. 1990). *First Federal* generally affirms the observation that Indiana law *does not* imply a duty of good faith in every contract. *Id.* at 604. In *First Federal*, the Indiana Supreme Court explored the general principles of contract construction and did not actually address whether and when to infer a duty of good faith in a contract. Instead, the Court said only that in interpreting an ambiguous contract, "the court may be required to presume the parties were acting reasonably and in good faith to discern the intention of the parties and resolve the ambiguity or uncertainty." *First Federal*, 559 N.E.2d at 604. At bottom, *First Federal* is not a case about when to infer a general duty of good faith and fair dealing in a contract. Instead, its reference to "good faith" arises in a discussion about how to approach issues of contract construction generally, and is applied in a context where the Supreme Court actually decided that the lower courts had *wrongly* construed a lease to impliedly

require reasonableness in the landlord's withholding of consent to a lease assignment.[1] ArcAngelo cannot cite a case in which a duty of good faith and fair dealing was found to be implied in a contract on the basis of the sort of ambiguity referenced in *First Federal* or the dictum in *Coates*.

But even if I consider Indiana law to imply an overall duty of good faith in a contract that is ambiguous as to whether it contains such a duty, I would not find such an implied duty here. This is because the DirectBuy Franchise Agreement states the exact opposite in §18.10: "If applicable law shall imply a covenant of good faith and fair dealing in this Agreement, the parties agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement." [DE 1-1 at 37.] The clause goes on to express four further attempts to limit the impact of any such implied duty, by staking out DirectBuy's ability to use its discretion in its own interest in the absence of bad faith. [*Id.*] The language of §18.10 clearly is inconsistent with any express assumption of a duty of good faith, and is not ambiguous about whether such a duty is to apply.

Because Indiana law provides no basis for an implied duty of good faith attaching to the parties' Franchise Agreements, that portion of Count I asserting a breach of such a duty is not plausible and is subject to dismissal for failure to state a claim.

Both parties treat Count I as if it also contains a third distinct claim of constructive termination of the franchises, based on the allegation that the fees in excess of the applicable 3% cap so significantly impacted the franchises' net income as to result in a *de facto* termination of

---

[1] Judge Hamilton, previously of the Southern District of Indiana, appears to have interpreted *First Federal* as I do, at most to support (where appropriate) "turn[ing] to an implied duty of good faith and fair dealing to help interpret [a] contract," but not to "support an independent tort claim." *Ball v. Versar, Inc.*, 2002 WL 33964449, *7 (S.D.Ind. Sept. 6, 2002) [Hamilton, J.].

7

the franchises.  Count I's heading does not identify it in that manner, referencing only breach of contract and breach of the duty of good faith.  As just discussed, the latter claim is being dismissed.  To the extent the constructive termination is alleged to constitute a breach of the Franchise Agreements, it survives this motion to dismiss for the reasons already explained.  To the extent the constructive termination is intended as a separate cause of action, DirectBuy's challenge to that theory was not articulated until its reply.  [DE 46 at 10.] The issue whether Indiana law recognizes such a claim has not been adequately briefed and will not be decided here.

**Tortious Interference with Contract - Count II**

Count II is a claim against Trivest for tortious interference with contract, the contract being the DirectBuy Franchise Agreements.  The theory is that after Trivest's acquisition of a controlling interest in DirectBuy's parent corporation in 2007, Trivest principals placed on DirectBuy's Board of Directors (including as Chairman of the Board) intentionally induced or directed the aggressive and expensive national marketing and advertising strategy that triggered the imposition of fees on DirectBuy franchisees in excess of the 3% cap they contend was applicable to such charges.  In support of dismissal of Count II, Trivest first makes the same contract interpretation argument that is discussed above and found not to support dismissal.  Nothing more needs to be said about that.

Second, Trivest points to the principle that an officer or director of a corporation, because he is the corporation's own agent, cannot be liable for tortious interference with the corporation's contracts.  *Trail v. Boys and Girls Clubs of Northwest Indiana*, 845 N.E.2d 130, 138 (Ind. 2006).  The argument is that where an agent's conduct is not actionable, neither can vicarious liability attach to the principal – Trivest in this case. [DE 46 at 11, n.10.] *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994) ("You can't have vicarious liability without primary liability.").  In *Trail*,

the Indiana Supreme Court explained the limited immunity an officer or director of a corporation has from most claims of tortious interference with the corporation's contracts:

> A party cannot "interfere" with its own contracts, so the tort itself can be committed only by a third party....In the case of a corporation, the legal entity acts through its directors and officers. Thus, when officers or directors act in their official capacity as agents of the corporation, they act not as individuals but as the corporation itself. In doing so, they are not acting as a third party, but rather as a party to the contract and cannot be personally liable for tortious interference with the contract.

*Trail*, 845 N.E.2d at 138. But directors and officers who act outside the scope of their official capacity "no longer act as agents of the corporation" and "therefore can be held personally liable for tortious interference." *Id.* They can then also potentially give rise to vicarious liability on the part of the puppeteer pulling their strings, as Trivest is here alleged to be.

Trivest argues that the individuals it elected to DirectBuy's board acted completely within the scope of their official duties, and that there are no allegations in the complaint to the contrary. Trivest argues that to be outside the scope of a director's duty, subjecting him or her to liability, conduct would have to involve "willful misconduct or recklessness," notions taken from Ind.Code §23-1-35-1(e) governing liability of corporate directors. In response, ArcAngelo argues that the complaint makes factual allegations supporting conclusions that Trivest acted unfairly and unreasonably, and had an "improper motive" namely to increase DirectBuy's revenues without reasonable regard for "the long-term consequences to the system." [DE 43 at 18.] I'm not sure what ArcAngelo means by "the system," but ArcAngelo's own contention that the Trivest proxies were motivated "to increase DirectBuy's revenues" sounds exactly like what

DirectBuy's Board of Directors should be working for in the interest of the corporation they serve.[2]

Criticism of the expensive marketing strategy as a short-sighted failure to consider the impact on DirectBuy franchisees' sustainability does not supply the sort of absence of justification required to support a tortious interference claim. The absence of justification – which sets this tort claim apart from a mere breach of contract – requires that "the interferer acted intentionally *without a legitimate business purpose*, and the breach *is malicious and exclusively directed to* the injury and damage of another.'" *Bilimoria Computer Systems, LLC v. America Online, Inc.*, 829 N.E.2d 150, 156-57 (Ind.Ct.App. 2005) (emphasis added). *See also Haegert v. McMullan*, 953 N.E.2d 1223, 1234-35 (Ind.Ct.App. 2011). Count II alleges that the Trivest proxies on DirectBuy's Board were motivated by a desire to increase cash flows into DirectBuy's coffers for the benefit of DirectBuy investors. The allegations do not identify an illegitimate business purpose or a malicious intent exclusively directed to the harm of the franchisees. The business judgment of these directors exercised in favor of DirectBuy over the interests of franchisees cannot give rise to vicarious liability for tortious interference.

At bottom, this case is fundamentally about a difference of opinion as to what the Franchise Agreement allows. DirectBuy reads the contract one way; the franchisees read it another way. And that is what the claim in Count I will resolve. But to the extent the case also reflects a disagreement between the franchisees and the franchisor as to the wisdom of expensive marketing efforts and their impact on the overall business model, that disagreement cannot be viably shoe-horned into a tortious interference claim. Count II will be dismissed.

---

[2] A director shall discharge his duties "in a manner the director reasonably believes to be in the best interests of the corporation." Ind. Code §23-1-35-1(a)(3).

**Criminal Conversion - Count III**

Both defendants are named in Count III, a civil claim of criminal conversion under Indiana law. ArcAngelo alleges that by causing DirectBuy to charge franchisees far in excess of the applicable 3% cap, the defendants took "unauthorized control" over the property of the Franchisees, constituting a criminal conversion under Indiana Code §35-43-4-3 and subjecting defendants to civil liability and treble damages under §34-24-3-1.

DirectBuy and Trivest launch several arguments against Count III. First, they argue that a criminal conversion claim can't substitute for breach of contract or failure to pay a debt. Where the source of a duty between the parties is a contract, Indiana courts have held that the gravamen of the action is contract construction and no criminal conversion claim lies. *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1167-68 (Ind.Ct.App. 2008). ArcAngelo responds that the criminal intent distinguishes a criminal conversion from a mere breach of contract, and that the requisite *mens rea* has been sufficiently alleged in the complaint. *Gilliana v. Paniaquas*, 708 N.E.2d 895, 899 (Ind.Ct.App. 1999) (the *mens rea* requirement "differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover"). In reply, DirectBuy argues for a factual conclusion that DirectBuy could not have been operating with the necessary "guilty mind," given the ruling of Judge Fehling in *Trinity*. This of course presumes both that I would agree with Judge Fehling's ruling and find it applicable to the factual scenario of this case. Unable to make those determinations at this stage, the argument must be rejected.

DirectBuy next argues that taking control of franchisees' money in payment of the assessed (though disputed) fees wasn't unauthorized, as is required for criminal conversion, because §3.07 of the Franchise Agreement contains the franchisees' consent to that sort of offset

of amounts owed. [DE 32 at 16.] Surely that can't excuse DirectBuy offsetting amounts it knew it wasn't entitled to, however, and ArcAngelo meets DirectBuy's argument with that response. Unauthorized control for purposes of the criminal conversion claim includes control exerted "in a manner or to an extent other than that to which the other person has consented." Ind. Code. §35-43-4-1(b)(2). In view of the parties' dispute about whether the charges were in excess of limits imposed by the Franchise Agreement, the franchisees' general consent to offsets does not defeat the criminal conversion claim.

DirectBuy's last and best challenge to the criminal conversion cause of action is that such a claim can apply only in circumstances involving "a determinate sum that the defendant was entrusted to apply to a certain purpose." *Trietsch v. Circle Design Group, Inc.*, 868 N.E.2d 812, 821 (Ind.Ct.App. 2007) (conversion claim inapplicable to dissenting minority shareholder's share of retained earnings on the sale of a closely-held corporation). A vehicle was properly the subject of a criminal conversion claim when the dealer refused to return it to the purchaser who'd brought it in for repair unless the purchaser made good on his earlier bounced check for the car's down payment. *Greco v. KMA Auto Exchange, Inc.*, 765 N.E.2d 140, 148 (Ind.Ct.App. 2002). A car is obviously a defined chattel. But when the subject of a criminal conversion claim is money, the definition becomes slightly more amorphous.

"Money may be the subject of an action for conversion, so long as it is capable of being identified as a special chattel." *Huff v. Biomet, Inc.,* 654 N.E.2d 830, 835-36 (Ind.Ct.App. 1995). This requires that the money in question be "a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Id.* A law firm's refusal to pay a lawyer his share of retained earnings has been found to be a mere failure to pay a debt and not actionable as a conversion. *Tobin v. Ruman*, 819 N.E.2d 78, 89 (Ind.Ct.App. 2005). Even a real estate broker's

refusal to return deposits paid toward a purchase of property that later fell through has been found not to support a claim of criminal conversion under Indiana law, because "a possessory interest in the specific funds" was not maintained by the prospective purchasers and the circumstances "merely amounted to a refusal to pay a debt." *Huff*, 654 N.E.2d at 836, discussing *Kopis v. Savage*, 498 N.E.2d 1266, 1269-70 (Ind.Ct.App. 1986), and *Stevens v. Butler*, 639 N.E.2d 662, 666 (Ind.Ct.App. 1994). The Indiana court noted that the seller in *Kopis* had "commingled the deposit with other unrelated accounts" and was not "'under any obligation to return *the specific* $40,000 which [Buyer] had given him.'" *Huff*, 654 N.E.2d at 836, quoting *Kopis*, 498 N.E.2d at 1270.

ArcAngelo argues that criminal conversion applies to monies "accounted for and held in a separate fund," citing *Midland-Guardian Co. v. United Consumers Club, Inc.*, 502 N.E.2d 1354 (Ind.Ct.App. 1987) [DE 43 at 22.] . *Midland-Guardian* involved the termination of an ongoing business relationship between a consumer club franchisor and a finance company. The Indiana Court of Appeals held that a contingency fund retained by the finance company, based on an agreed-upon percentage of the price it paid for installment contracts purchased from the franchisor (the "hold-back reserve account"), was money that belonged to the franchisor and was "in effect, entrusted to Midland to be separately held and accounted for," as to which a criminal conversion claim might apply. *Id*. at 1355. Plaintiffs argue that the challenged sums at issue in this case were supposed to be separately held and accounted for in the Marketing and Legislative Fund, circumstances similarly determinate and therefore sufficient for a criminal conversion claim.

But even if the Marketing and Legislative Fund existed and was the basis for the assessment of the disputed fees as ArcAngelo alleges, the fees assessed were not money that, like

in *Midland-Guardian*, continued to belong to the plaintiffs but was merely held and accounted for separately by the defendant, subject to contingent future events. Instead, the assessed fees were paid to DirectBuy to be used for the development of marketing programs and not subject to return to the franchisees in certain circumstances. Nor were the amounts withheld from various franchisees maintained and accounted for separately from one another, but commingled in the common fund for marketing programs, and no longer could be said to constitute a definable chattel as to each franchisee in particular. If as plaintiffs here contend, fees for advertising were over-charged in excess of applicable limits, it merely constituted an overcharge to be repaid and not an appropriation of a separate, identifiable chattel.

The dispute here is much more akin to *French-Tex*, in which a claim that a landlord over-billed its tenants for more than a decade was found to be based on a question of contract interpretation and to "constitute a bona fide contract dispute and not a claim for conversion." 893 N.E.2d at 167. The franchisees do not claim a possessory interest in any definite and identifiable sum of money that they retained ownership of but entrusted to DirectBuy, who later wrongfully appropriated it. Because the facts alleged do not plausibly support a claim for criminal conversion as that claim has been interpreted by the courts of Indiana, Count III is properly dismissed.

**Unjust Enrichment – Count IV**

DirectBuy challenges the unjust enrichment claim in Count IV, contending that Indiana law forecloses such a claim "where an express contract controls the parties' rights." [DE 32 at 18.] The Indiana Court of Appeals has stated the general rule that "[t]he existence of an express contract precludes a claim for unjust enrichment because: (1) a contract provides a remedy at law;

and (2) as a remnant of chancery procedure, a plaintiff may not pursue an equitable remedy when there is a remedy at law." *Coppolillo v. Cort*, 947 N.E.2d 994, 998 (Ind.Ct.App. 2011).

ArcAngelo responds that the equitable claim of unjust enrichment is pled as an alternative to the breach of contract claim, invoking an exception to the general rule should there be a determination that the Franchise Agreement does not fully address the subject of the parties' dispute. In *Coppolillo*, the Indiana Court of Appeals introduced a new exception to the rule barring equitable relief on an unjust enrichment theory where the parties' dispute is governed by a contract. Following the law of several other states, the court held that "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Id.*

In *Coppolillo*, the circumstances obviously involved conduct lying outside the boundaries of the parties' express agreement. Coppolillo, a chef, arranged to buy a share of the restaurant's ownership from Cort. The parties' contract provided for Coppolillo to pay Cort $50,000 for 100 shares of stock, payable on the execution of the agreement. *Id.* But the parties did not dispute that they had actually agreed to a total purchase price of $100,000 with the additional $50,000 to be paid in monthly installments over several years. *Id.* After Cort sold the real estate out from under the restaurant, which then closed, Coppolillo sued Cort for unjust enrichment based on the side payments. No breach of the express contract was alleged. Because it was "undisputed" that the arrangements were "not fully controlled by the Agreement," there was room for equity to address the dispute in addition to the law of contracts. *Id.* The *Coppolillo* court distinguished other cases in which "there was no evidence that the contract failed to address all aspects of the parties' relationship." *Id.*

Since the *Coppolillo* decision in 2011, only one other published Indiana case addresses the exception to the general rule. In *Kohl's Indiana, L.P. v. Owens*, 979 N.E.2d 159, 167-68 (Ind.Ct. App. 2012), the Indiana Court of Appeals found the *Coppolillo* exception inapplicable, rejecting Kohl's contention that its road-improvement agreement with the county board of commissioners did not fully control the rights of the parties as to who would bear the cost of such improvements, even in the event that a larger development project was not completed.

Here a breach of contract claim has been pled and the parties advocate competing interpretations of several different provisions of the Franchise Agreement that they contend govern the charges ArcAngelo now disputes. This is the polar opposite of the scenario in *Coppolillo*, where the parties *agreed that their contract did not address* the side payments on which the unjust enrichment claim was based. Here there is no serious contention, much less agreement, that the Franchise Agreement will not ultimately be found to govern the question whether DirectBuy was authorized to impose the disputed charges in the manner it did. The relationship between Franchisor and Franchisee was set out in the Franchise Agreement which under the law of contracts will be interpreted to determine whether or not the fees were authorized by the contract or constituted a breach of the Franchise Agreement. In this context, the parties' contractual relationship provides a remedy at law and precludes a claim for unjust enrichment. *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 221 (Ind. 2009) (the existence of express contract terms regarding the subject matter precludes the substitution of a quasi-contractual equitable remedy for unjust enrichment). Count IV will be dismissed.

**Breach of Fiduciary Duty – Count V**

Count V asserts a claim that DirectBuy breached a fiduciary duty to the franchisees. DirectBuy contends that the claim must be dismissed because it had no such fiduciary duty, citing

§17.01 of the Franchise Agreement disclaiming such a relationship and citing Indiana law "that arms-length contractual agreements do not give rise to a fiduciary relationship creating a duty." [DE 32 at 19.] Section 17.01 of the Franchise Agreement speaks plainly: "Franchisor and Franchisee, as between themselves, are and shall be independent contractors.  Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence." [DE 1-1 at 33.] Section 7.01 of the Franchise Agreement, the section specifically devoted to the Marketing and Legislative Fund, expressly provides that DirectBuy does "not act as trustee or in any other fiduciary capacity with respect to the Marketing and Legislative Fund." [*Id.*  t 20.]

Indiana cases repeatedly observe that ordinary business relationships based on arms-length contracts do not establish fiduciary relationships between the parties.  *Paul v. Home Bank SB*, 953 N.E.2d 497, 504 (Ind.Ct.App. 2011); *American Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind.Ct.App. 2010); *Wilson v. Lincoln Federal Sav.  Bank*, 790 N.E.2d 1042, 1046-47 (Ind.Ct.App. 2003).  Citing inapposite cases, ArcAngelo is unable to overcome this legal principle which, augmented here by the express disclaimers in the parties' agreement, defeats a claim for breach of fiduciary duty.  Count V is subject to dismissal.

**Declaratory Judgment – Count VI**

Section 18.05 of the Franchise Agreement contains this language:

Except with respect to any of [franchisee's] obligations herein regarding the Confidential Information and the Marks, Franchisor and Franchisee (and its Owners) each waives, to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other.  [Franchisee and each of its owners] waive, to the fullest extent permitted by applicable law, the right to recover consequential damages for any claim directly or indirectly arising from or relating to this Agreement.  Furthermore, the parties agree that any legal action in connection with this Agreement shall be tried to the court sitting without a jury, and all parties waive any right to have any action tried by jury.

[DE 1-1 at 36.]  In Count VI, ArcAngelo seeks a declaratory judgment that these provisions of the Franchise Agreement that deprive franchisees of their right to a jury trial and prohibit the recovery of punitive damages are void and unenforceable under Indiana law as against public policy.  DirectBuy contends the claim should be dismissed because Indiana law holds that the right to jury trial may be contractually waived and damages limitations are likewise subject to contractual agreement.

Indiana law recognizes that its constitutional right to jury trial may be waived, and that a freely-bargained agreement waiving the right is enforceable.  *Sanford v. Castleton Health Care Center, LLC*, 813 N.E.2d 411, 420 (Ind.Ct.App. 2004); *Scott v. Crussen*, 741 N.E.2d 743, 746 (Ind.Ct.App. 2000); *1st Source Bank v. Ryan Contracting Company*, 2008 WL 2002228 at *1 (N.D.Ind. May 5, 2008).  The Indiana Supreme Court has also upheld the enforceability of exculpatory clauses that limit damages liability.  *Trimble v. Ameritech Publishing, Inc.*, 700 N.E.2d 1128, 1129 (Ind. 1998).  "Indiana courts have...upheld numerous contractual provisions that, in one way or another, limit the legal avenues available to a party when such provisions are freely negotiated and not unjust or unreasonable."  *1st Source Bank*, 2008 WL 2002228 at *1.

Plaintiffs are unable to overcome the force of these precedents contrary to their claim.  ArcAngelo cites a case in which the federal court in Indianapolis held that a distribution agreement's waiver of jury trial was unenforceable because it violated the Indiana Deceptive Franchise Practices Act, which prohibits franchise contract provisions "[l]imiting litigation brought for breach of the agreement in any manner whatsoever."  Ind.Code §23-2-2.7-1(10).  *Carrel v. George Weston Bakeries Distribution, Inc.*, 2006 WL 2524124 at *2 (S.D.Ind. 2006).  But DirectBuy points out that the IDFPA applies to agreements involving "a franchisee who is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana."

18

Ind.Code §23-2-2.7-1.  The plaintiff franchisees are not Indiana residents and their franchises are not operated in the State.  So the IDFPA is not applicable, which may explain why it is not cited in Count VI itself as a basis for the claim of unenforceability.

ArcAngelo's general arguments that the jury trial waiver and damages limitations are contrary to public policy don't attempt (and therefore don't succeed) in distinguishing the contrary case law supporting DirectBuy's motion to dismiss Count VI.  Finally, ArcAngelo argues that as to the criminal conversion claim in Count III, the Indiana Crime Victim Statute makes the trebling of damages mandatory, so that a contrary provision in the Franchise Agreement would be against public policy.  Indiana Code §34-4-30-1 has long since been amended, however, so that an award of treble damages is discretionary rather than mandatory.  *White v. Indiana Realty Associates II*, 555 N.E.2d 454, 456 n.1 (Ind. 1990).  Even if Count III were otherwise to survive the motion to dismiss, this argument would not save the challenge to the Finance Agreement's damages limitation.  Count VI is subject to dismissal because under Indiana law, it presents no plausible right to relief.

ACCORDINGLY:

Plaintiffs Motion for Leave to Submit Supplement Authority [DE 47] is GRANTED.

Defendants' Motion to Dismiss [DE 31] is DENIED IN PART as to the breach of contract claim in Count I, and GRANTED IN PART as to the breach of a duty of good faith claim in Count I, and Counts II, III, IV, V and VI.

SO ORDERED.

ENTERED: November 20, 2013     /s/ Philip P. Simon
                               **PHILIP P. SIMON, CHIEF JUDGE**
                               **UNITED STATES DISTRICT COURT**